**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

      v.

LAVERNE SINGLETARY,

         Defendant.

**REPORT AND**
**RECOMMENDATION**
13-CR-6065

## Preliminary Statement

The issue before the Court is whether an individual walking alone on a public sidewalk during the evening hours, holding in one hand an unidentified object covered by a small brown paper bag, is sufficient evidence that "criminal activity may be afoot" so as to justify a forcible seizure of that individual pursuant to Terry v. Ohio, 392 U.S. 1, 30 (1968). Because I find that such behavior does not give reasonable suspicion to justify a "Terry stop," it is my Report and Recommendation that the defendant's motion to suppress be granted.

## Procedural Background

On April 30, 2013, defendant Laverne Singletary was indicted on three counts of possession of marijuana with intent to distribute, possession of a firearm in furtherance of a drug trafficking crime, and a felon in possession of a firearm. See Indictment (Docket # 14). Currently before the Court is a motion by the defendant to suppress statements and tangible evidence obtained during an October 6, 2012 stop, arrest, and search of the

defendant. (Docket # 22).  The defendant also seeks suppression of evidence based on the destruction of video surveillance.  Id.  The Government has filed papers in opposition to the motion.  (Docket # 23).

A suppression hearing was held on October 10-11, 2013,[1] after which both the Government and defense counsel filed supplemental briefs.  By Order of Judge Frank P. Geraci, Jr., dated April 30, 2013, all pretrial motions have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)—(B).  (Docket # 15).

#### Facts

The testimony adduced at the suppression hearing revealed that on October 6, 2012, Rochester Police Department ("RPD") Officer Amy Pfeffer was working the "Night Watch," a law enforcement detail in which local probation officers assist members of the Rochester Police Department with their street crime investigations as they patrol the City in marked police vehicles.  Tr. 9—10.  Officer Pfeffer's "partner" that evening was Monroe County Department of Probation Officer Robert Masucci.  Id.  At approximately 10:45 p.m., Officer Pfeffer and Probation Officer Masucci were driving southbound on Roth Street toward Flower Street in the city of Rochester, New York, when they observed an individual, later

---

[1] Citations to the hearing transcript of October 10 are referred to as "Tr.", and citations to the hearing transcript of October 11 are referred to as "Tr. B".

2

identified as the defendant Laverne Singletary (hereinafter "Singletary" or defendant), walking down a public sidewalk on the west side of the street. Tr. 10—12. Officer Pfeffer was driving, and Probation Officer Masucci was in the passenger seat of the police vehicle. Tr. 12. Singletary was facing towards the police vehicle as it approached. Id. Officer Pfeffer first noticed Singletary from a distance of approximately ten car lengths. Tr. 13. He was alone and, according to Officer Pfeffer, was doing nothing suspicious when she first observed him. Tr. 66, 78. However, as the police vehicle got closer to Singletary, Officer Pfeffer claims she observed Singletary holding an object in his right hand. Tr. 12—13.

The object was described by Officer Pfeffer in varying degrees of detail. In the police report Officer Pfeffer prepared after Singletary's arrest, she stated that she "observed" Singletary walking northbound of Roth Street "with an open container of Bud Ice 24 Oz beer in his hand." See Defense Exhibit "M." Officer Pfeffer made no mention of a brown bag covering a beer can in her police report. In fact, on direct examination at the suppression hearing, Officer Pfeffer testified that she was unable to see what was in the can, only that she saw Singletary holding in his right hand "a container" covered by a "brown paper bag." Tr. 12—13. Officer Pfeffer described the container as about as big as "a standard size of a beer," but, unlike the detail in her police report, testified she was unable to tell what kind of can it was.

3

Id. On cross examination Officer Pfeffer testified that it was not until she pointed a vehicle mounted spotlight on Singletary that she observed him holding anything in his hand. Tr. 67—68. On direct examination Officer Pfeffer testified that Singletary was "[o]nly a couple feet away" when she "first placed my spotlight on him." Tr. 14. On cross examination, Officer Pfeffer stated that she was twenty feet from Singletary when she first used the spotlight and that she "wouldn't have seen" the brown bag without the aid of the spotlight. Tr. 68, 70. Officer Pfeffer stated that when she first observed Singletary she "had no idea" what was beneath the paper bag, but that in her experience brown paper bags are "covering up alcoholic beverages." Tr. 17, 77—78. Officer Pfeffer testified that she would have used the spotlight to illuminate anyone on the street that evening because the neighborhood was "a high violence area and I'm always interested to see who is down there." Tr. 68.

After observing the brown paper bag in Singletary's hand, Officer Pfeffer told Probation Officer Masucci, "[S]top that guy. He has an open container." Tr. 67. Probation Officer Masucci pulled the police vehicle up next to Singletary and both officers exited the car. Tr. 14. Even as she approached the defendant on foot, Officer Pfeffer did not know what Singletary was holding in his hand. Tr. 17. During the time she was watching the defendant on Roth Street, Officer Pfeffer agreed that she never observed Singletary raise the brown bag to his mouth to take a drink. Tr.

4

73. She did not see Singletary stumble, yell, or cause any kind of disturbance. Tr. 78. Officer Pfeffer testified that it was the paper bag that gave her a reason to direct Probation Officer Masucci to stop the defendant. Tr. 77—78.

Upon exiting the police car, Officer Pfeffer faced Singletary and ordered him to "stop." Tr. 14. Officer Pfeffer stated that Singletary replied, "Who me?" and began walking away from Officer Pfeffer. Tr. 14, 16. Probation Officer Masucci, who had then positioned himself in front of Singletary, attempted to stop the defendant by reaching out and placing his hand on the "right shoulder area" of Singletary. Tr. 16. At this point, Singletary "threw the can behind him and then he pushed Officer Masucci's hand off of him and then proceeded to run." Tr. 17. A potion of the can's contents spilled on Officer Pfeffer, and she testified that she immediately smelled beer on her clothing. Tr. 18. Both Probation Officer Masucci and Officer Pfeffer gave chase. Tr. 19. As Officer Pfeffer was about to tackle Singletary in the front yard of 86 Roth Street, she looked down to make sure there was no debris on the ground. Id. Singletary lost his footing on some rocks, and Officer Pfeffer recalled that she, Probation Officer Masucci, and the defendant all fell to the ground at the same time. Tr. 20. Officer Pfeffer testified that Singletary was struggling as she attempted to get his hands behind his back and place handcuffs on them. Id. Once the handcuffs were in place, Officer Pfeffer and Probation Officer Masucci lifted the defendant off the ground, and

Officer Pfeffer observed "a Browning handgun located where the area of the struggle was." Tr. 21. Singletary was placed under arrest and was searched. Tr. 22—23. In Singletary's "front hoodie pocket," Officer Pfeffer found thirteen bags of marijuana. Tr. 24—25. The defendant was then transported to the Monroe County Jail. Tr. 60—61.

Sometime after the arrest of the defendant, Officer Pfeffer and Probation Officer Masucci visited RPD's "camera room" to ascertain whether a pole camera on Roth Street captured any part of their encounter with Singletary. Tr. 29, 49. After reviewing some video footage that showed part of the incident, Officer Pfeffer filled out a "burn request form" asking for a copy of the footage to be burned to a DVD. Id. Julie Gulino, a public safety aide with RPD, testified that in October 2012 she received a written "burn request form" from Officer Pfeffer. Tr. B 6—7. The request form described the date of the incident, the time of the video being requested, and general information describing the incident. Id. Ms. Gulino confirmed that she made a copy of the pole camera footage requested by Officer Pfeffer, and thereafter she provided the DVD to Officer Pfeffer. Tr. B 9—12. A copy of the DVD was received in evidence at the suppression hearing and was viewed by the Court both during and after the hearing. See Government Exhibit "1."

6

## Discussion

A. The Terry Stop of Singletary: The legality of Officer Pfeffer's initial actions towards Singletary must be evaluated pursuant to Terry v. Ohio, 392 U.S. 1 (1968). In Terry, the Supreme Court held that a police officer may briefly seize someone if the officer reasonably suspects the person of being involved in criminal activity. Id. at 30. Two Terry related issues arise immediately: (1) Did Officer Pfeffer's initial contact with Singletary constitute a seizure under the Fourth Amendment?, and (2) If Singletary was seized, did Officer Pfeffer have "a reasonable, articulable suspicion that criminal activity [was] afoot"? See Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry, 392 U.S. at 30).

1. Was There a Seizure?: The Fourth Amendment applies only to "searches and seizures" within the meaning of the Constitution. It follows that if Singletary was not initially seized, there was no Fourth Amendment violation. California v. Hodari D., 499 U.S. 621 (1991), provides guidance on defining a seizure under the Fourth Amendment. In Hodari D., the defendant discarded a small rock of crack cocaine while fleeing from officers. Id. at 623. The State conceded that the officers lacked reasonable suspicion to stop the defendant, so the critical issue for the Court was whether the defendant was "seized" for Fourth Amendment purposes when he saw the officers rushing towards him. Id. The Supreme Court held that

7

a seizure of an individual occurs only when one actually submits to an assertion of authority by the police or when physical force is applied in order to restrain someone. Id. at 624—25. Particularly significant to the present case was the Court's holding in Hodari D. that a seizure occurs even when the application of physical force is "ultimately unsuccessful." Id. at 626. Applying Hodari D. to the incident at issue here, the mere fact that Singletary initially escaped Probation Officer Masucci's grasp by pushing his hand away is of no significance for Fourth Amendment purposes. As the Court stated in Hodari D., "the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing" the suspect, is sufficient for a seizure. Id. at 624. The moment Probation Officer Masucci put his hands on Singletary's right shoulder, a seizure occurred, and the officers' actions must be measured under the Fourth Amendment.[2]

2. Was There Reasonable Suspicion of Criminal Activity?: In Terry v. Ohio, the Supreme Court reiterated that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." Terry, 392

_____

[2] Because I find that Singletary had not been seized until Probation Officer Masucci grabbed his shoulder, any claim that his pre-stop statement to Officer Pfeffer ("Who me?") must be suppressed because he was in custody and entitled to Miranda warnings is without merit.

8

U.S. at 9 (quoting Union Pac. Ry. Co. v. Botsford, 141 U.S. 250, 251 (1891)). The grounds for a Terry stop "must exist at the time of the seizure." United States v. Simmons, 560 F.3d 98, 107 (2d Cir. 2009). Moreover, "[t]he suspicion that criminal activity is afoot must be both reasonable and articulable, and an inchoate and unparticularized suspicion or hunch of criminal activity is insufficient to justify even a brief detention for the purpose of investigation." United States v. Muhammad, 463 F.3d 115, 121 (2d Cir. 2006) (internal quotation marks and citation omitted). "Based upon [the] whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417 (1981).

Based on the "whole picture" as testified to by Officer Pfeffer, I find that the initial seizure of Singletary was not supported by an objective and particularized basis that would reasonably allow one to suspect that Singletary was engaging in criminal activity. Singletary was walking down a public sidewalk carrying an object that Officer Pfeffer thought might be a container holding a liquid. Tr. 12—13. The container itself was obscured by a brown paper bag. Id. The officers had received no reports of illegal behavior or suspicious activity in that area prior to the seizure of the defendant. Tr. 68. There was no evidence or suggestion of facts that might be consistent with the public consumption of an alcoholic beverage, such as a party or

boisterous, loud, or unruly behavior.  Contrary to the description contained in her police report, Officer Pfeffer testified she never observed Singletary carrying a can of any kind, let alone an open container filled with an alcoholic beverage.  Tr. 17.  Officer Pfeffer never observed Singletary stagger, stumble, or sway.  Tr. 78.  Officer Pfeffer never saw Singletary do anything or say anything to suggest he had been drinking.  Indeed, despite watching Singletary closely both before and after turning the spotlight on him, Officer Pfeffer never saw Singletary raise the object he was carrying anywhere near his mouth.  Tr. 73.

The defendant's refusal to cooperate with Officer Pfeffer's direction to stop is also not objective evidence that Singletary was engaging in criminal activity.  "An individual approached by an officer who has no reasonable suspicion of wrongdoing may ignore the officer and go about his business, and his refusal to cooperate may not form the basis for his detention."  Muhammad, 463 F.3d at 123.  See also United States v. Goines, 604 F. Supp. 2d 533, 542 (E.D.N.Y. 2009) ("The bare fact that [defendant] tried to leave the scene cannot create reasonable suspicion").  Officer Pfeffer's testimony that it was after dark and Singletary was walking in a "high violence area" does not elevate Singletary's behavior into a reasonable belief of criminal activity.   Of course, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."

10

Wardlow, 528 U.S. at 124.  While Officer Pfeffer characterized the
location as "high violence," her decision to stop Singletary was
not because of any evidence of suspected violence but was based
solely on the fact that she surmised an object obscured by a brown
paper bag was an open can of beer.  As to the time of day, the stop
here did not occur in the wee hours of the morning but at 10:45 in
the evening — hardly a time when one would find walking down a
public sidewalk particularly suspicious behavior.

I credit Officer Pfeffer's testimony that she would have used
the spotlight to illuminate anyone on the street that evening
because the neighborhood was "a high violence area and I'm always
interested to see who is down there."  Tr. 68.  However, being
"interested in who is down there," no matter how well intentioned,
does not permit seizures that do not conform fully to the Fourth
Amendment.  Ultimately it was the existence of the brown paper bag
that made Officer Pfeffer suspect that (1) what Singletary was
holding was a beverage container, (2) that the beverage container
currently held an alcoholic beverage, and (3) that the container
was not only open but also not empty.  My finding is not that
Officer Pfeffer had no reason to think that Singletary was walking
down Roth Street carrying a can of beer covered by a brown paper
bag.  In fact, I have no reason to doubt that she did.  However,
based on the facts presented at the suppression hearing, I conclude
that Officer Pfeffer's suspicion of criminal activity could only
reasonably rise to the level of a "hunch," and a "hunch of criminal

11

activity is insufficient to justify even a brief detention for the purpose of investigation." <u>Muhammad</u>, 463 F.3d at 121 (<u>citing</u> <u>Terry</u>, 392 U.S. at 27). <u>See also</u> <u>United States v. Swindle</u>, 407 F.3d 562, 569 (2d Cir. 2005) ("The officers certainly may have suspected [the defendant of criminal behavior], but the relevant question is whether that suspicion was reasonable."). In this case, Officer Pfeffer's <u>Terry</u> stop of the defendant was not supported by reasonable suspicion that criminal activity was afoot.

B. The Second Seizure of Singletary: Having determined that the initial stop of Singletary violated his Fourth Amendment right to be free from an unreasonable seizure, it would be reasonable to assume that any evidence derived from the improper <u>Terry</u> stop should be suppressed. However, dicta contained in the Supreme Court's <u>Hodari D.</u> decision has complicated the "fruit of the poisonous tree" analysis in cases where the incident extends beyond the initial seizure. In <u>Hodari D.</u>, Justice Scalia posed a hypothetical "example" of behavior that might purge the taint of an illegal seizure.

> To say that an arrest is effected by the slightest application of physical force, despite the arrestee's escape, is not to say that for Fourth Amendment purposes there is a continuing arrest during the period of fugitivity. If, for example, [the officer] had laid his hands upon Hodari to arrest him, but Hodari had broken away <u>and had then</u> cast away the cocaine, it would hardly be realistic to say that that disclosure had been made during the course of an arrest.

12

Hodari D., 499 U.S. at 625 (emphasis added).   Under Justice Scalia's example, even if an initial seizure violates the Fourth Amendment, the suspect's attempt at escape renders the initial illegality irrelevant, and the police are given the benefit of a "clean slate" in evaluating their conduct during the period of "fugitivity."   Id.

Although dicta, a number of federal and state courts have found the analysis quoted above to be persuasive when evaluating police conduct occurring after an illegal seizure.   See, e.g., United States v. Hickson, No. 4:13-cr-24(CDL), 2014 WL 583005, at *4 (M.D. Ga. Feb. 13, 2014) ("[E]ven if one accepts the argument that the Defendant in the present case was seized when the officer touched him during his flight, it also follows that each time the Defendant broke free from the officer's touch and continued his flight, he was not under arrest until he was touched again."); United States v. Williams, 608 F. Supp. 2d 325, 330 (E.D.N.Y. 2008) ("By breaking free of the [officer's] grasp, [the defendant] rendered the legality of that seizure an irrelevancy"); People v. Henderson, 989 N.E.2d 192, 203 (Ill. 2013) (collecting cases) (finding that defendant's flight interrupted the causal connection between the officer's misconduct and the subsequent disclosure of contraband by the defendant during flight); Johnson v. State, 689 So. 2d 376, 378 (Fla. Dist. Ct. App. 1997) ("[E]ven if appellant is deemed to have initially been seized by the police, his subsequent flight and contemporaneous tossing was a revocation of his

submission so as to bring the tossing of the gun outside the temporal scope of the seizure."). <u>See also</u> <u>United States v. Castillo</u>, 238 F.3d 424, 2000 WL 1800481, at *6 (6th Cir. Nov. 28, 2000) (unpublished table decision) (concluding that a suspect's fleeing an unlawful detention "constituted an intervening act that purged the taint of his detention"); <u>Ludwig v. Anderson</u>, 54 F.3d 465, 471 (8th Cir. 1995) ("<u>Hodari D.</u> instructs that many different seizures may occur during a single series of events.").[3]

Applying this analysis to Singletary's encounter with law enforcement on October 6, 2012, however, does not alter the Court's view that the defendant's suppression motion should be granted. According to Officer Pfeffer's testimony, Singletary spilled beer on her <u>before</u> he was able to break free of Probation Officer Masucci's grasp. In her sworn testimony to the Court, Officer Pfeffer described the sequence of events as follows: "The defendant threw the can behind him and <u>then</u> he pushed Officer Masucci's hand off of him and <u>then</u> proceeded to run." Tr. 17 (emphasis added). A review of the surveillance video footage, although dark and blurry, appeared consistent with Officer Pfeffer's testimony. <u>See</u> Government Exhibit "1." Thus, while Officer Pfeffer was now able to confirm her hunch that the substance in the container was in

---

[3] The impact of applying this dicta has been criticized by the Second Circuit in an analogous holding. <u>See</u> <u>United States v. Baldwin</u>, 496 F.3d 215, 220 (2d Cir. 2007) ("We acknowledge that this rule could create an incentive for the police to issue unreasonable orders to stop in the hopes of creating reasonable suspicion or probable cause.").

14

fact alcohol, that confirmation took place <u>during and not after</u> the initial seizure of the defendant. <u>See, e.g.</u>, <u>United States v. Parker</u>, 214 F. Supp. 2d 770, 779 (E.D. Mich. 2002) (suppressing evidence obtained as a result of an illegal <u>Terry</u> stop as "fruit of the poisonous tree," despite defendant's flight after illegal seizure).

This Court recognizes that "[t]he concept of reasonable suspicion . . . is not readily, or even usefully, reduced to a neat set of legal rules." <u>United States v. Sokolow</u>, 490 U.S. 1, 7—8 (1989). Instead, the Court must determine whether reasonable suspicion exists by considering "the totality of the circumstances." <u>Id.</u> Officer Pfeffer's testimony made clear that nothing happened during the period of Singletary's fugitivity, aside from his flight, that would have provided a new, independent basis to chase, tackle, and search him. In <u>Illinois v. Wardlow</u>, the Supreme Court rejected a per se rule that flight alone gave reasonable suspicion to justify a stop. <u>See</u> <u>Wardlow</u>, 528 U.S. at 125—26. Instead, flight is only one consideration in "the totality of the circumstances" analysis. <u>Id.</u> Based on the totality of the circumstances in this case, Officer Pfeffer did not have reasonable suspicion to justify a second <u>Terry</u> stop of the defendant.

It is well established that "[a]ny evidence seized based upon an illegal stop is subject to the fruit of the poisonous tree doctrine, and may be suppressed." <u>United States v. Scopo</u>, 19 F.3d 777, 781 (2d Cir. 1994) (internal quotation marks removed). In

15

determining whether to suppress the Browning handgun and marijuana seized during on October 6, 2012, this Court must consider "whether, granting establishment of the primary illegality, the evidence to which the instant objection is made" was obtained "by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, 488 (1963). I find that the weapon and marijuana were obtained "by exploitation of" an illegal seizure, and the evidence is the fruit of that illegality. For this reason, it is my Report and Recommendation that the defendant's motion to suppress the weapon found during the second seizure and the marijuana seized during the search incident to the arrest should be **granted**.

C.  The Destruction of Video Surveillance Evidence: The defendant also argues that video surveillance footage of the October 6, 2012 incident must be suppressed based on the government's failure to preserve a greater portion of the pole camera video. Because the defendant has failed to present any evidence that the government acted in bad faith, it is my Report and Recommendation that the motion be **denied**. See Arizona v. Youngblood, 488 U.S. 51, 58 (1988) ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.").

## Conclusion

For the foregoing reasons, it is my Report and Recommendation that defendant's motion to suppress the tangible evidence obtained during the October 6, 2012 stop, arrest, and search (Docket # 22) be **granted**, and that defendant's motion to suppress statements and video surveillance evidence be **denied**.

**SO ORDERED.**


_/s/ Jonathan W. Feldman_
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:   May 20, 2014
         Rochester, New York

17

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York.[4]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections ... shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b)(2) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

   /s/ Jonathan W. Feldman   
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:    May 20, 2014
          Rochester, New York

---

[4] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).